1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

NORTHWEST ECOSYSTEM ALLIANCE, et al.,

               Plaintiffs,

    v.

MARK E. REY, et al.,

               Defendants.

No. C04-844P

ORDER GRANTING IN PART AND
DENYING IN PART PLAINTIFFS'
MOTION AND DENYING
DEFENDANTS' MOTION

      This matter comes before the Court on the parties' cross-motions for summary judgment. (Dkt. Nos. 40 & 58).  Having reviewed the pleadings, the administrative record, and the additional supporting materials, and having heard oral argument by the parties, the Court hereby GRANTS in part and DENIES in part Plaintiffs' motion and DENIES Defendants' motion.  Defendants failed to comply with the National Environmental Procedure Act ("NEPA"), 42 U.S.C. § 4321 et seq., in preparing the 2004 Final Supplemental Environmental Impact Statement to Remove or Modify the Survey and Manage Mitigation Measure Standards and Guidelines ("2004 SEIS").  Defendants failed to analyze potential impacts to Survey and Manage species if they are not added to or are removed from the Forest Service's and BLM's respective programs for special status species.  Defendants failed to provide a thorough analysis of their assumption that the late-successional reserves would

1  adequately protect species that the Survey and Manage standard was introduced to protect,

2  particularly in light of their previous positions in earlier environmental impact statements.  Lastly, the

3  Survey and Manage standard was deemed a hindrance to hazardous fuel treatments, which served as

4  part of the justification for eliminating the standard.  However, Defendants failed to disclose and

5  analyze flaws in their methodology for calculating the acreage in need of hazardous fuel treatments.

6  Part of the cost analysis was similarly flawed because it relied on the acreage in need of hazardous fuel

7  treatments in calculating the cost of the Survey and Manage standard.

8       The Court does not reach Plaintiffs' claims under the National Forest Management Act

9  ("NFMA"), 16 U.S.C. § 1601 et seq., and the Federal Land Policy and Management Act ("FLPMA"),

10  43 U.S.C. § 1701.  Pending further compliance by the Agencies with NEPA, there is no need to

11  address the merits of Plaintiffs' NFMA and FLPMA claims.

12       The Court denies without prejudice Plaintiffs' request for an injunction.  Further briefing on

13  this issue is necessary.  The Court will not enter a final judgment until it has ordered the appropriate

14  injunctive relief.

15                                BACKGROUND

16       A coalition of environmental and conservation groups have filed suit against the Departments

17  of Agriculture and Interior (collectively "the Agencies") challenging actions taken by the Agencies in

18  2004 to eliminate from the Northwest Forest Plan a particular set of standards and guidelines, called

19  the "Survey and Manage" standard, used to protect certain rare and uncommon species in forested

20  land in Washington, Oregon, and northern California.  The current controversy originates with the

21  controversy that began in the early 1990s over the spotted owl and logging in old growth forests in

22  these three states.

23       In <u>Seattle Audubon Soc'y v. Evans</u>, 771 F. Supp. 1081 (W.D. Wash. 1991), *aff'd* 952 F.2d

24  297 (9th Cir. 1991), the honorable William L. Dwyer enjoined the Forest Service from selling logging

25  rights until it adopted standards and guidelines to ensure the viability of the owl.  In response, the

ORDER - 2

Forest Service prepared an environmental impact statement ("EIS") and issued a Record of Decision ("ROD") adopting the Forest Service's preferred alternative from the EIS.  In Seattle Audubon Soc'y v. Moseley, 798 F. Supp. 1473 (W.D. Wash. 1992), *aff'd sub nom.* Seattle Audubon Soc'y v. Espy, 998 F.2d 699 (9th Cir. 1993), Judge Dwyer rejected the Forest Service's EIS and the ROD because the Forest Service had not complied with NEPA.

In 1993, President Clinton created an interagency, interdisciplinary team called the Forest Ecosystem Management Assessment Team ("FEMAT") to address the issues raised in the on-going spotted owl litigation.  He directed the FEMAT to adopt an ecosystem management approach.  The FEMAT evaluated and identified ten alternative management options for the forested land at issue; it recommended Option 9.  (Forest Ecosystem Management: An Ecological, Economic, and Social Assessment ("the FEMAT report")).[1]  In 1994, the Departments of Agriculture and Interior prepared a supplemental environmental impact statement ("SEIS") to assess these ten alternatives; they identified Alternative 9 (which was based on Option 9 in the FEMAT report) as the preferred alternative.  In 1994, the Secretaries issued a ROD adopting Alternative 9, which became known as the Northwest Forest Plan ("the Plan").  In 1994, Judge Dwyer upheld the legality of the Plan.  Seattle Audubon Soc'y v. Lyons, 871 F. Supp. 1291, *aff'd sub nom.* Seattle Audubon Soc'y v. Moseley, 80 F.3d 1401 (9th Cir. 1996).

The purpose of the Plan is two-fold: first to protect the long-term health of the forest ecosystem, and second to provide a sustainable supply of timber and other forest products.  (94 ROD 25-26).[2]  The Plan covers 24.5 million acres of Forest Service and Bureau of Land Management ("BLM") land in Washington, Oregon, and northern California that is within the range of the northern

---

[1]  This and all of the other major documents cited are part of the administrative record. However, unless otherwise noted, all citations are to the actual documents.

[2]  All NEPA documents are referred to as follows: the first two numbers are the year, followed by the acronym for the document, followed by the page(s) in the document.

1   spotted owl.  There are three categories of land under the Plan: 1) "Reserves" which is made up of

2   Congressionally Reserved Areas, Late-Successional Reserves ("LSRs"), Administratively Withdrawn

3   Areas, and Riparian Reserves, 2) "Matrix" where most timber cutting occurs, and 3) Adaptive

4   Management Areas ("AMAs") for the development and testing of new management approaches.  The

5   Reserves are designed to protect late-successional and old-growth habitat and manage previously

6   disturbed forests so that they may become late-successional forests.  (94 ROD 8).

7       Of the 24.5 million acres of land under the Plan, the Reserves make up approximately 19

8   million (78%), the Matrix makes up 4 million (16%), and the AMAs make up 1.5 million (6%).  Of the

9   total 24.5 million acres, approximately 8 million acres are late-successional and old-growth[3] ("LSOG")

10  forests.  Of this 8 million, approximately 6.9 million (86%) is in the Reserves and 1.1 million (14%) is

11  in the Matrix and AMAs.

12      When the Agencies were preparing the SEIS based on the FEMAT report, public comments

13  prompted them to conduct additional evaluations of certain species associated with LSOG forests.  As

14  a result of these evaluations, the Agencies added certain mitigation measures, also called standards and

15  guidelines, "to increase protection of habitat for species whose habitat assessments were relatively low

16  under Alternative 9 [based on Option 9 from the FEMAT report]."  (94 SEIS B-143).  These

17  measures were adopted in the 1994 ROD, thus becoming part of the Plan.  There were four primary

18  mitigation measures: 1) manage known sites of certain species; 2) conduct surveys prior to ground-

19  disturbing activities; 3) conduct extensive surveys to find high priority sites for hard-to-find species;

20  and 4) conduct general regional surveys to gain information about poorly known species.  (94 SEIS B-

21  143 to 144).  Grouped together, these are known as the "Survey and Manage" standards and

22

23  _____

24      [3]  In these documents, late-successional is distinct from old-growth.  Late-successional refers
    to forests that are between 80 and 200 years old.  Old-growth refers to forests that are older than 200
25  years old.

ORDER - 4

1  guidelines.  Approximately 400 species, which included both vertebrates and non-vertebrates, were

2  listed under the Survey and Manage standard.  (94 SEIS B-150-162; 94 ROD C4-5).

3      In 2000, the Agencies prepared a SEIS to evaluate the Survey and Manage standard.  The

4  Agencies sought to evaluate their previous six years of experience in administering the Survey and

5  Manage standard and to respond both to unforseen problems that had developed since its

6  implementation and additional information learned about the species, which together left the Agencies

7  "unable to fully meet the original purpose and need" of the Plan.  (00 SEIS 9-10).  The 2001 ROD

8  amended certain provisions of the Survey and Manage standard to streamline its implementation.  (01

9  ROD 8).

10     In 2001, timber industry groups challenged the 2001 ROD alleging that timber producing land

11  had been transferred to permanent reserves in violation of various substantive environmental statutes

12  governing management of forest land.  Environmental groups also challenged the 2001 ROD.  The

13  cases were consolidated (before an Oregon district court).  The Agencies and the timber industry

14  entered a settlement agreement requiring the Agencies to consider in a new SEIS completely

15  eliminating the Survey and Manage standard and instead rely on specific programs run by the BLM

16  and Forest Service to protect certain species.  Douglas Timber Operators v. Rey, No. 01-6378-AA (D.

17  Or.).  (04 SEIS2 180; 04 SEIS 5, 20-21).  The environmental groups dismissed their lawsuit pending

18  the new SEIS.

19     The Agencies prepared a SEIS in January, 2004.  The 2004 SEIS examined three alternatives:

20  1) retaining the Survey and Manage standard (the no-action alternative), 2) eliminating it, and 3)

21  retaining but modifying it to remove the uncommon species category, eliminating the pre-disturbance

22  survey requirement for young forest stands, and changing the review process for excepting known

23  sites from management.  (04 SEIS 24).  Eliminating the Survey and Manage standard was the

24  preferred alternative.  In March, 2004, the Agencies issued a Record of Decision to Remove or

25

1   Modify the Survey and Manage Mitigation Measure Standards and Guidelines ("2004 ROD")

2   adopting the preferred alternative identified in the 2004 SEIS.

3          The SEIS analyzed the impact of eliminating the Survey and Manage standard for the 296

4   species still covered by the standard.  (Between 2001 and 2004, species were removed from the

5   standard, pursuant to the Survey and Manage amendments in the 2001 ROD, leaving 296 species and

6   4 arthropod functional groups included under the standard.)  In analyzing the environmental effects on

7   Survey and Manage species, the Agencies assumed that the Reserve system would adequately protect

8   these species.  Further, they assumed that 152 of the 296 species would be included in the Agencies'

9   "Special Species Status" Programs.  The BLM has Special Status Species policies and the Forest

10  Service has Sensitive Species policies, which are collectively referred to as the Agencies' Special

11  Status Species Programs ("SSS Programs").  The SSS Programs are meant to avoid actions which

12  may lead to listing a species as threatened or endangered under the Endangered Species Act.

13         Plaintiffs filed suit against the Under Secretary of the Department of Agriculture and the

14  Assistant Secretary of the Department of the Interior, both of whom signed the 2004 ROD on behalf

15  of their respective departments, as well as the Forest Service, which is within the Department of

16  Agriculture, and the BLM, which is within the Department of Interior.  Plaintiffs allege that, by

17  adopting the 2004 ROD, all Defendants violated NEPA, the Forest Service violated NFMA, and the

18  BLM violated FLPMA.  Plaintiffs claim that Defendants' actions which violate these statues are

19  arbitrary and capricious and not in accordance with law, and therefore should be vacated under the

20  Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq.

21                                    ANALYSIS

22  I.  Declarations and Exhibits Outside the Administrative Record

23         Plaintiffs submitted four declarations and six exhibits in support of their motion.  (Brumley

24  Decl., Dellasala Decl., Furnish Decl., Odion Decl., Exs. A-F).  The Agencies move to strike all of

25  these materials.

ORDER - 6

1    As a general rule, judicial review of agency actions is limited to the administrative record.

2    Lands Council v. Powell, 395 F.3d 1019, 1029 (9th Cir. 2005) (citing Florida Power & Light Co. v.

3    Lorion, 470 U.S. 729, 743-33 (1985)).  However, evidence outside the record may be considered

4    when "necessary to determine whether the agency has considered all relevant factors and has explained

5    its decision, ... when supplementing the record is necessary to explain technical terms or complex

6    subject matter," id. at 1030, or when the agency has "swept stubborn problems or serious criticism

7    under the rug."  National Audubon Soc. v. Forest Serv., 46 F.3d 1437, 1447 (9th Cir. 1993)

8    (quotation and citation omitted).

9    While these exceptions are construed narrowly, they are nonetheless applicable to the

10   declarations at issue here.  The Brumley, Furnish,  Dellasala, and Odion declarations fit within these

11   narrow exceptions.  As outlined in Plaintiffs' reply brief, the substance of these declarations were

12   provided to the Agencies in various comments on the draft EIS.  (Plfs' Reply at 9-10).  Consideration

13   of these declarations does not violate the letter or the spirit of the briefing page limits.  Nor have

14   Plaintiffs violated any rules of civil procedure by relying on such declarations to support their summary

15   judgment motion.  The Court need not address the exhibits because the Court reached its ruling

16   without relaying on any of these exhibits.  The Agencies' motion to strike is denied.

17   II.  Standard of Review

18   Compliance with NEPA, NFMA, and FLPMA is reviewed under the APA.  Under the APA,

19   the reviewing court shall set aside agency actions found to be arbitrary and capricious, an abuse of

20   discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).  Native Ecosystems

21   Council v. Dombeck, 304 F.3d 886, 891 (9th Cir. 2002) (applying APA standard to NEPA and

22   NFMA claims); ONRC Action v. Bureau of Land Mgmt., 150 F.3d 1132, 1135 (9th Cir. 1998)

23   (applying APA standard to FLPMA claims).  In determining whether an agency decision was arbitrary

24   and capricious, the reviewing court "must consider whether the decision was based on a consideration

25   of the relevant factors and whether there has been a clear error of judgment."  Marsh v. Oregon

ORDER - 7

1    <u>Natural Res. Council</u>, 490 U.S. 360, 378 (1989) (internal quotation omitted, citing <u>Citizens to</u>

2    <u>Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 416 (1971)).

3         NEPA directs federal agencies to prepare an environmental impact statement for all federal

4    actions significantly affecting the environment. 42 U.S.C. § 4332(2)(C). The purpose of NEPA is

5    two fold. "First, it places upon a federal agency the obligation to consider every significant aspect of

6    the environmental impact of a proposed action. Second, it ensures that the agency will inform the

7    public that it has indeed considered environmental concerns in its decisionmaking process." <u>Baltimore</u>

8    <u>Gas & Elec., Co. v. Nat. Res. Def. Council, Inc.</u>, 462 U.S. 87, 97 (1983). The EIS must provide the

9    federal agencies with enough detailed information to decide whether to proceed with an action in light

10   of the likely environmental consequences and to provide the public with such information so that the

11   public can participate meaningfully in the process. <u>Idaho Conservation League v. Mumma</u>, 956 F.2d

12   1508, 1519-20 (9th Cir. 1992). Among other things, the EIS must contain a "reasonably thorough

13   discussion of the significant probable environmental consequences," <u>id.</u> at 1519 (internal quotes and

14   citation omitted), and must discuss the environmental impacts of the proposed action and alternatives

15   to the proposed action. This process requires the agency to take a "hard look" at the potential

16   environmental consequences of the proposed action. <u>Kern v. Bureau of Land Mgmt.</u>, 284 F.3d 1062,

17   1066 (9th Cir. 2002).

18        "NEPA does not mandate particular results, but simply describes the necessary process that an

19   agency must follow in issuing an EIS." <u>Westlands Water Dist. v. Dept. of Interior</u>, 376 F.3d 853, 865

20   (9th Cir. 2004) (internal quotation and citation omitted). If the agency took the requisite hard look,

21   judicial review is at an end. Under NEPA's deferential standard, the reviewing court "must defer to an

22   agency's decision that is fully informed and well-considered, but [it] need not forgive a clear error of

23   judgment." <u>Metcalf v. Daley</u>, 214 F.3d 1135, 1141 (9th Cir. 2000) (internal quotations and citations

24   omitted). In short, NEPA prohibits uninformed agency action, but does nothing to prohibit unwise

25

1  agency action.  Center for Biological Diversity v. Forest Serv., 349 F.3d 1157, 1166 (9th Cir. 2003)

2  (citing Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 351 (1989)).

3          Plaintiffs maintain that the 2004 SEIS violated NEPA in six ways: 1) the purpose and need

4  statement in the 2004 SEIS is unreasonably narrow because it failed to analyze whether the existing

5  Survey and Manage standard is effective, 2) the 2004 SEIS failed to consider in detail a reasonable

6  alternative that Plaintiffs had proposed, 3) the environmental effects analysis is illegally predicated on

7  uncertain possible events, namely that the 152 eligible species will be included in the Agencies' SSS

8  Programs, 4) the Agencies' assumption that the Survey and Manage species will be adequately

9  protected by the Reserve system is false and misleading, 5) the disclosures in the 2004 SEIS related to

10  fire are false and misleading, and 6) the cost rationale in the 2004 SEIS is subterfuge and the figures

11  inflated.

12          A.  The Purpose and Need Statement

13          The regulations implementing NEPA require that an EIS specify "the underlying purpose and

14  need to which the agency is responding in proposing the alternatives including the proposed action."

15  40 C.F.R. §§ 1502.10(d), 1502.13.  Agencies are afforded considerable, although not unlimited,

16  discretion to define the purpose and need of a project.  Friends of Southeast's Future v. Morrison, 153

17  F.3d 1059, 1066 (9th Cir. 1998).  A statement of purpose and need is evaluated under a

18  "reasonableness standard."  Westlands Water Dist., 376 F.3d at 866.  Under this standard, an agency

19  may not define the purpose in unreasonably narrow terms.  "[A]n agency may not define the objectives

20  of its action in terms so unreasonably narrow that only one alternative from among the

21  environmentally benign ones in the agency's power would accomplish the goals of the agency's action,

22  and the EIS would become a foreordained formality."  Citizens Against Burlington, Inc. v. Busey, 938

23  F.2d 190, 196 (D.C. Cir. 1991); see City of Carmel-By-The-Sea v. Dept. of Transp., 123 F.3d 1142,

24  1155 (9th Cir. 1997) ("The stated goal of a project necessarily dictates the range of 'reasonable'

25  alternatives and an agency cannot define its objectives in unreasonably narrow terms.").  At the same

ORDER - 9

1   time, however, a purpose and need statement need not be so broad as to require consideration of

2   alternatives that are inconsistent with the proposed action's overarching purpose. Friends of

3   Southeast's Future , 153 F.3d at 1066 (citing City of Angoon v. Hodel, 803 F.2d 1016 (9th Cir.

4   1986)).

5          According to the statement of need in the 2004 SEIS, the Survey and Manage standard had

6   unanticipated impacts that were frustrating the Agencies' ability to achieve the Plan's goals.  (04 SEIS

7   3).  It interfered with the goal of protecting the health of the forests because it restricted "forest health

8   treatments."  (04 SEIS 5).  More significantly, it was one of several reasons that the Agencies were

9   not providing a predictable and sustainable supply of timber for harvest.  (04 SEIS 3).  The 2000 SEIS

10  had predicted that the Survey and Manage standard would reduce the annual volume of timber for

11  harvest by 51 million board feet.  However, the 2004 SEIS states that by 2004, the effect of the

12  Survey and Manage standard on the volume of timber that could be harvested was estimated to be

13  more than twice that predicted in 2000.  (04 SEIS 6-7).  The needs section concluded "[t]he

14  underlying needs to which the Agencies are responding are healthy forest ecosystems and a sustainable

15  supply of timber and other forest products, to the extent these are frustrated by the Survey and

16  Manage Standards and Guidelines."  (04 SEIS 5).  The 2004 SEIS identified four purposes: 1) to meet

17  the terms of the settlement agreement, which required the Agencies to consider eliminating the Survey

18  and Manage standard and relying on the SSS Programs to protect the health of the forest; 2) to

19  continue providing for the diversity of plant and animal communities as required by NFMA and

20  conserving rare and little known species at risk of being listed under the Endangered Species Act; 3)

21  to reduce the Agencies' cost, time, and efforts associated with conservation of rare and little known

22  species, and; 4) to achieve timber output and resource management goals contemplated by the Plan.

23  (04 SEIS 5-6).

24         Plaintiffs do not dispute that the Plan's goals (e.g. healthy forests and a sustainable supply of

25  timber) are reasonable.  Plaintiffs maintain that by framing the need and purpose of the 2004 SEIS as

ORDER - 10

1    evaluating how the Survey and Manage standard hindered achievement of the Plan's goals and

2    ignoring the standard's effectiveness in achieving the Plan's goals, the only alternative that would

3    satisfy the SEIS's purposes was elimination of the Survey and Manage standard, which rendered the

4    SEIS an empty formality.  Plaintiffs argue that this commits the precise error discussed in City of

5    Carmel-By-The-Sea and Citizens Against Burlington.  Plaintiffs point to the 2004 SEIS's

6    acknowledgment that the choice of purpose and need "substantially limited the range of reasonable

7    alternatives available for analysis and provided a relatively narrow scope for this action."  (04 SEIS

8    84).

9           The purpose and need statement in the 2004 SEIS does not violate NEPA.  Courts have

10   rejected similar arguments in cases in which the purpose of the EIS has been defined equally if not

11   more narrowly and which arguably made a certain outcome a foreordained conclusion.  See

12   Muckleshoot Indian Tribe v. Forest Serv., 177 F.3d 800, 812-13 (9th Cir. 1999) (defining the purpose

13   as using private-public land swaps in an EIS evaluating such a land swap was reasonable in light of the

14   regional forestry plan whose purpose was to consolidate land ownership patterns for consistent

15   management); Friends of Southeast's Future, 153 F.3d at 1066-67 (defining the purpose as a timber

16   sale, which excluded the no-action alternative, was reasonable given the overarching goals of the

17   regional forest plan to balance wilderness, wildlife, and fish needs with timber harvesting needs).

18   While City of Carmel-By-The-Sea and Citizens Against Burlington announce general principles

19   regarding the scope of the purpose and need statement, neither held that the statement at issue in those

20   cases was unreasonable.  Notably, Plaintiffs have not pointed to any Ninth Circuit cases holding that a

21   purpose and need statement was unreasonable.

22          With almost 10 years of experience implementing the Survey and Manage standard and 3-4

23   years since it was amended, it was reasonable to assess the ways in which it was frustrating the

24   Agencies' ability to achieve the Plan's goals.  Furthering the Plan's goals is certainly reasonable.

25   While the purpose and need statement at issue here might very well reflect the Agencies' bias against

the Survey and Manage standard and inclination to eliminate it, "NEPA does not require that agency officials be subjectively impartial." Metcalf, 214 F.3d at 1142.  It merely requires that the proposed action "be objectively evaluated." Id.  By considering maintaining the Survey and Manage standard in the no-action alternative and modifying the standard in Alternative 3, the Agencies fulfilled this obligation and disclosed the positive aspects of the standard.  Furthermore, the purpose statement included compliance with the Agencies' statutory duties of providing a diversity of plant and animals.

### B.  Consideration of Plaintiffs' Proposed Alternative

Consideration of alternatives is at the heart of an EIS.  40 C.F.R. § 1502.14.  In considering alternatives, the agencies must:

> (a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.
> (b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits....

40 C.F.R. § 1502.14.  An EIS's range of alternatives is reviewed under a "rule of reason," which requires that the agency consider reasonable alternatives necessary to permit a reasoned choice, but does not require the agency to consider an infinite range of alternatives.  Carmel–by-the-Sea, 123 F.3d at 1155.  The failure to consider a reasonable alternative renders the EIS invalid.  Friends of Southeast's Future, 153 F.3d at 1065.  However, "[t]he range of alternatives that must be considered in the EIS need not extend beyond those reasonably related to the purposes of the project."  Westlands Water Dist., 376 F.3d at 868 (internal quotation and citation omitted).

Plaintiffs argue that the Agencies failed to consider a "restoration logging" alternative that Plaintiffs maintain would achieve the desired timber harvest volume and preserve the Survey and Manage standard.  They had proposed this alternative to the Agencies during the SEIS drafting process.  Under Plaintiffs' restoration logging alternative, the Agencies would allow thinning in dense younger stands, including stands in the Reserves.  According to Plaintiffs, the resulting timber volume would be greater than that possible by eliminating the Survey and Manage standard and allowing

logging of previously restricted LSOG stands in the Matrix and AMAs.  In addition, Plaintiffs maintain that this alternative would decrease the risk of wildfire posed by the dense young stands which present more of a fire risk than LSOG forests, decrease costs because there are fewer rare and uncommon Survey and Manage species in younger stands and therefore fewer surveys would be required, provide numerous ecological benefits for these young stands in attaining many of the attributes of old-growth forests, and benefit wildlife by preventing logging of LSOG forests in the Matrix and AMAs.

In the section of the SEIS where the Agencies respond to comments from the public, the Agencies stated that they considered this alternative but deemed it not worthy of detailed analysis because it did not meet the purpose and need.  (04 SEIS2 188).  Furthermore, the Agencies characterized this alternative as similar to Alternative 1 considered in the 1994 SEIS.  (04 SEIS 85).

Plaintiffs maintain that their alternative is not the same as Alternative 1 considered in the 1994 SEIS because Alternative 1 prohibited any logging in Reserves, whereas their alternative would have allowed thinning in younger stands in the Reserves.  The Agencies counter that this is not a meaningful difference because not only is thinning these younger stands already permitted under the Plan, but more importantly the volume from thinning in the Reserves does not "count" towards calculating the annual Probable Sale Quantity ("PSQ").

The PSQ is an estimate of the volume of sustainable timber harvest that is likely to be achieved annually.  (94 SEIS 3&4-263).  The 1994 SEIS stated:

> The PSQ is based only on lands that are considered suitable for the production of programmed, sustainable timber yields.  Timber suitable lands are those lands physically and economically suited to timber production that are outside of lands designated for forest uses considered incompatible with programmed, sustained timber harvests. Timber suitable lands are located only in the [M]atrix or in Adaptive Management Areas [AMAs].  Lands designated as Congressionally Reserved Areas, Administratively Withdrawn Areas, Late-Successional Reserves, and Riparian Reserves [collectively the Reserves] are considered unsuitable for sustained timber yields.[4]  These lands are therefore not included in calculations of PSQ.

_____

[4]  "Sustained yield" was defined in the 1994 SEIS as "[t]he yield that a forest can produce continuously at a given intensity of management."  (94 SEIS Glossary 17).

1    (94 SEIS 3&4-263).  Specifically, the PSQ did not include the volume that might be obtained by

2    thinning, salvage, or other treatments in Reserves land.  (94 SEIS 3&4-264).  The 1994 ROD made

3    clear the PSQ is an estimate, not a minimum or a maximum.  (94 ROD 19).

4          Because the Reserves are not considered suitable for sustained timber yields, the PSQ does not

5    and cannot include volume from thinning, and therefore it was reasonable not to consider this

6    alternative in detail.  Even though Alternative 1 in the 1994 SEIS did not allow logging in the

7    Reserves and Plaintiffs's restoration logging alternative would, any potential increase in volume from

8    thinning in the Reserves does not change the PSQ and therefore does not fall within the purpose of the

9    proposed action.  This supports the Agencies' contention that the SEIS need not have considered in

10   detail Plaintiffs' alternative because it did not meet the purpose of the SEIS.  Even though it may be

11   true that the restoration logging alternative would increase timber volume, continue to protect the

12   health of the forests, and reduce costs, it would not increase the volume available for sustained timber

13   yields (as represented by the PSQ) and as such would not satisfy one of the purposes of the SEIS.  For

14   this same reason, the 2004 SEIS's presumption that 90% of the PSQ volume must come from LSOG

15   forests in the Matrix and AMAs is reasonable.  The 2004 SEIS stated "the PSQ is heavily dependent

16   on harvesting late-successional forest for 3 to 5 more decades until early-successional stands begin to

17   mature and become available for harvest.  Because of this dependence, harvest schedules indicate

18   about 90 percent ... of PSQ over the next decade is dependent on harvest of late-successional forest."

19   (04 SEIS 220).

20         Plaintiffs take issue with the Agencies' reliance on the PSQ, pointing to the fact that the PSQ is

21   not required by statute or regulation.  However, the point is not the PSQ per se, but rather the goal of

22   producing a sustainable timber yield.  The PSQ is merely an estimate of that yield.  The focus on a

23   sustainable timber yield is a reasonable one that has been part of the Plan from the beginning.

24   Thinning would not produce a sustainable timber yield because it is a one-time event.  In contrast,

25   LSOG forests, once logged, can be replanted for future logging.  Plaintiffs have not shown that it was

ORDER - 14

1    arbitrary and capricious not to consider volume from thinning the Reserves in estimating the annual

2    sustainable timber yield.

3        Plaintiffs also argue unpersuasively that the 2004 SEIS referred to a variety of factors as the

4    cause of the lower than expected timber yields under the Plan, but then singled out the Survey and

5    Manage standard as the sole culprit thereby justifying its elimination.  They maintain that there is no

6    evidence that eliminating the Survey and Manage standard will increase the PSQ.  The SEIS should

7    have, they argue, provided analysis of these other factors.  However, the SEIS did in fact discuss why

8    the timber sales were less than contemplated.  (04 SEIS 221-24).  While the SEIS identified the

9    Survey and Manage standard as the primary cause, it acknowledged that court injunctions in other

10   cases have also contributed.  The SEIS's discussion of this particular issue was sufficient.

11       C.  The Assumption That Some Species Would Be Included in the SSS Programs

12       The 2004 SEIS explicitly assumed that 152 species will be added to the SSS Programs, but

13   acknowledged that the Forest Service and BLM regional officers "have not exercised their authority to

14   add species to the [SSS] Program[s] ...."  (04 SEIS 25).  Species are added to these programs at the

15   discretion of the Regional Foresters and State Directors within the Forest Service and BLM

16   respectively.  (Id.)  The SEIS included a lengthy discussion of each Agency's respective SSS Program

17   and which species are eligible for which SSS Program.  (04 SEIS 46-58).  In response to a comment

18   from the public that the preferred alternative (eliminating the Survey and Manage standard) should

19   mandate adding these species to the SSS Programs, the Agencies stated "[a]gency policy delegates the

20   authority to determine which species will be included on the Special Status Species lists to the

21   Regional Foresters and State Directors.  Using this SEIS to mandate immediate species additions

22   would be contrary to existing policy."  (04 SEIS2 180).

23       Plaintiffs argue that the analysis of the effects of eliminating the Survey and Manage standard is

24   predicated on including these species in the SSS Programs, but fails to ensure that this will happen.

25   This, according to Plaintiffs, is a false and misleading analysis of the effects of eliminating the Survey

ORDER - 15

1   and Manage standard.  The Agencies counter that it is reasonable to assume that the Agencies will

2   follow their own policies and will include all eligible species.  As support, they point to the fact that,

3   since the issuance of the 2004 ROD, these species have in fact been included in the SSS Programs.

4   (Defs' Mot., Ex. A).[5]

5           The 2004 SEIS fails to analyze what would happen if the Regional Foresters and State

6   Directors exercised their discretion and chose not to include some otherwise eligible species in the

7   SSS Programs or to remove species that have been included.  Whether it is reasonable or not to

8   presume that the Regional Foresters and State Directors will follow their Agencies' respective policies

9   on including eligible species, it is a discretionary decision to include or not include any of these

10  species.  While it may be beyond the scope of this SEIS or ROD to mandate that these species be

11  included in the SSS Programs, there is no guarantee that the Regional Foresters and State Directors

12  will exercise their discretion by including the species and continuing to include them.  As such, the

13  Agencies should have informed the public and the decisionmakers of the environmental effects on

14  these species if they were not included or were removed from these Programs.  This situation is

15  analogous to <u>Espy</u> where the Forest Service based its impacts analysis on an assumption that the BLM

16  would follow a particular plan, which the BLM subsequently declined to do.  The Ninth Circuit held

17  that the EIS was invalid in part because it rested on "false assumptions regarding the cooperation of

18  other agencies ...."  998 F.2d at 704.  While the assumption in <u>Espy</u> was proved to be false and the

19  assumption here that the Regional Foresters and State Directors will exercise their discretion to

20  include and continue to include eligible species in the SSS Programs has not proven to be false, it is

21  still an assumption based on uncertain future events that there is no guarantee will occur.

22          D.  The Assumption that Late-successional Reserves Will Adequately Protect Survey and
    Manage Species

23

24  ────────────────

25          [5]  While this is not part of the administrative record, it shows that the species have been
    included in the SSS Programs.

ORDER - 16

1        In its analysis of the environmental consequences of eliminating the Survey and Manage

2    standard, the 2004 SEIS claimed that most species associated with late-successional and old-growth

3    will likely be adequately protected by the Reserve system given that 80% of the Plan area and 86% of

4    late-successional and old-growth forests are in the Reserves.  (04 SEIS 131).  The 2004 SEIS

5    recognized, however, that "[t]here may be greater uncertainty about some late-successional and old-

6    growth forest related species, such as those that have limited distribution and that are highly intolerant

7    of disturbance."  (04 SEIS 131).  The 2004 SEIS analyzed the impact of eliminating the Survey and

8    Manage standard on each of the Survey and Manage species.  (04 SEIS 141-215).

9        Plaintiffs argue that the Agencies did not take a hard look at the condition of the late-

10   successional reserves ("LSRs") in the Reserve system and whether they really will be able to protect

11   Survey and Manage species.  Specifically, Plaintiffs contend that the Agencies' assumption regarding

12   how these species will fare in the LSRs was wrong.  According to Plaintiffs, these species will not be

13   adequately protected by the LSRs because these areas are more degraded than the 2004 SEIS

14   discloses.  Plaintiffs maintain that the Agencies' own prior analysis in the 1994 and 2000 SEISs as well

15   as the FEMAT report show the degraded condition of the LSRs for old-growth associated species.

16   The Survey and Manage standard was adopted, according to Plaintiffs, precisely to mitigate this

17   problem.  The Agencies counter that the LSRs have always been considered more functional than

18   Plaintiffs assume and have always been the primary management tool for these sensitive species.

19   According to the Agencies, the assumption in the 2004 SEIS that the LSRs (together with the SSS

20   Programs) can adequately protect these species was consistent with previous analysis by the FEMAT

21   and the Agencies in the 1994 and 2000 SEISs.

22       The parties' arguments boil down to a dispute about whether the FEMAT's and the Agencies'

23   prior analysis concluded that the Reserve system alone would not be adequate and the Survey and

24   Manage standard was necessary to ensure these species' viability.  Approximately 42% of LSR land is

25   actually LSOG forests (37% of the total Reserves is LSOG forests).  (FEMAT IV-54).  These LSOG

1   forests "tend to be distributed in a highly fragmented mosaic ...." (94 SEIS 3&4-29).  Both the

2   FEMAT and the Agencies in the 1994 SEIS thoroughly analyzed the likelihood of achieving late-

3   successional ecosystem attributes.  (FEMAT rpt. II-36, IV-69 to 70; 94 SEIS 3&4-43 to 45).  The

4   SEIS identified possible mitigation measures to increase the likelihood of achieving late-successional

5   ecosystem attributes under the various alternatives considered.  (94 SEIS 3&4-46 to 49).  The Survey

6   and Manage standard and guidelines were among these possible mitigation measures.  They also

7   thoroughly analyzed the likelihood of maintaining sufficient and well-distributed habitat to provide for

8   the continued existence of viable populations of species associated with LSOG forests.  (FEMAT II-

9   25).  While most vertebrates had an 80% likelihood or greater, some non-vertebrates (i.e. lichens,

10  bryophytes, fungi, arthropods, and mollusks) were below 60%.  (FEMAT II-28; II-35).

11  Consequently, the FEMAT could only conclude that these species would be maintained within the

12  LSRs where they were found.  Due to the lack of information on these species together with the fact

13  that many are locally endemic or inherently rare and sensitive to habitat disturbance, FEMAT had little

14  confidence that these species would find well-distributed habitat for the next 100 years.  (FEMAT II-

15  34).

16          In discussing the origin of the Survey and Manage standard, the 2000 SEIS noted that the

17  Plan, with the Survey and Manage standard, "was deemed to provide the most appropriate level of

18  management for late-successional and old-growth forest related species while providing a sustainable

19  and predictable level of timber harvest and other forest uses." (00 SEIS 8).  The 2000 SEIS noted

20  that the mitigation measures adopted, including the Survey and Manage standard, are only part of the

21  overall strategy of the Plan to meet species' persistence objectives.  (00 SEIS 18).  The Reserve

22  system, not the Survey and Manage standard, is the primary management tool for these species.  (00

23  SEIS 26).  However, while the standard was not the primary management tool for these species, the

24  2000 SEIS acknowledged that the standard was created to address concerns that certain species might

25  be so rare or isolated that the Reserve system would not provide reasonable assurance of their

persistence. Echoing the FEMAT report, the SEIS noted that this concern was due to a lack of scientific information, small and endemic populations associated with scarce habitats, and impacts from previous management. (00 SEIS 8, 26). In discussing the problems caused by the Survey and Manage standard, the 2000 SEIS noted that these problems did not warrant "a wholesale reorientation away from Survey and Manage measures." (00 SEIS 10). The Agencies did not consider eliminating or expanding the Survey and Manage standard "because the overall concept of Survey and Manage has not yet been implemented and monitored long enough to thoroughly evaluate its overall effectiveness in meeting species persistence objectives." (01 ROD 2). "The information presently available does not indicate any other feasible alternatives exist that would satisfy the foundational objective underlying the Northwest Forest Plan. The Agencies will continue to acquire new information to markedly improve implementation in a way that will increase efficiencies and provide the Agencies with information that may facilitate a more fundamental shift at an appropriate time." (00 SEIS 10).

    As the above passages make clear, the FEMAT team's and the Agencies' respective analysis in 1994 was thorough. They never definitively stated that the Reserves were so degraded that they were non-functional LSOG forests. However, they did conclude that these non-vertebrate species had a less than desired likelihood of persistence under the Reserve system. While the Agencies are correct that part of the concern over these species' viability was due to a lack of information, the Survey and Manage standard was introduced to address both this lack of information and the concern that these species would not persist under the Reserve system. Further, even though the Survey and Manage standard was only a part of the overall strategy to protect these species, it was a necessary part to satisfy the Plan's "foundational objectives."

    The note in the 2000 SEIS regarding "new information" that would warrant a "more fundamental shift" (i.e. eliminating the Survey and Manage standard) begs the question of whether the Agencies had such "new information" and disclosed it in the 2004 SEIS. The 2004 SEIS identified the

1    following information as new since the 2000 SEIS: 1) increased wildfires in 2002, which probably had

2    mixed effects on Survey and Manage species but nonetheless was not more than what was

3    contemplated by the Plan, 2) information gained from surveys, 3) changes under the "annual species

4    review" pursuant to the 2001 ROD which removed some species from the standard, changed the range

5    or others, and changed the category of others.  (04 SEIS 112-13).  More generally, at oral argument

6    counsel for the Agencies pointed to new information from years of experience implementing the

7    standard and new information based on that experience regarding costs.  None of this information

8    addresses whether conditions have changed such that the Survey and Manage standard is no longer a

9    necessary part of the overall management of these species.

10            Counsel also argued that apart from this more general new information, the Agencies have the

11   discretion to change their opinion about the best way to balance the Plan's two goals.  While true, this

12   misses the point.  The point is not that the Agencies can or cannot chose to eliminate the Survey and

13   Manage standard in an effort to re-balance the Plan's goals (which is an issue beyond the scope of

14   NEPA).  Rather, the point under NEPA is that the Agencies' analysis of the environmental impacts of

15   eliminating the standard is premised on an assumption that is inconsistent with their own prior analysis

16   and therefore appears to lack support.  Even if including the Survey and Manage standard as a part of

17   the Plan was a policy choice by the Agencies in 1994, just as eliminating the standard is the Agencies'

18   policy choice in 2004, the Agencies have an obligation under NEPA to disclose and explain on what

19   basis they deemed the standard necessary before but assume it is not now.  In sum, the 2004 SEIS

20   failed to provide a thorough analysis of this issue to permit the public and the decisionmakers to make

21   a reasonably informed decision.

22            As an additional argument, Plaintiffs contend that the 2004 SEIS's disclosure regarding the net

23   increase in acreage of LSOG forests is inadequate.  This particular argument is not persuasive.  In

24   assessing the environmental consequences of eliminating the Survey and Manage standard, the 2004

25   SEIS stated that late-successional forests (80 to 200 years old forests) are increasing at 2.5 times the

ORDER - 20

1   projected rate of loss of old-growth forests (200 plus years old forests) that would occur due to fire

2   and to logging made possible by the elimination of the Survey and Manage standard.  (04 SEIS 110).

3   The SEIS counted each passing year as increasing the acreage of late-successional forests (i.e. when a

4   79 year old stand of Douglass Firs planted after a clear cut becomes an 80 year old stand, it is counted

5   as a late-successional forest).

6   　　　　Plaintiffs do not dispute that this is occurring.  Rather, they argue that the SEIS failed to

7   acknowledge that there is a qualitative difference in terms of quality of habitat for Survey and Manage

8   species between an 80 year old stand of almost exclusively one species of tree and a 200 plus year old

9   stand of old-growth.  Plaintiffs point to the 1994 SEIS's acknowledgment of this qualitative

10  difference:

11  > As much as 40 percent of the Late-Successional Reserves currently in young
12  > plantations were established for timber production.  Typically, the plantations are
    > densely stocked with young Douglas-fir trees, and are unlikely to follow natural stand
    > development pathways toward late-successional conditions.  Consequently, late-
13  > successional forest development in these plantations may be retarded or may not occur
    > at all.

14  (94 SEIS 3&4-49).  Relaying on a declarations by Dr. Dominick Dellasala, Plaintiffs assert that there

15  is a significant difference; some bryophytes and lichen species are uniquely associated with old-growth,

16  and forests re-planted after clear cuts present unique problems because these forests are not

17  sufficiently diverse in tree species and structural diversity to support certain species such as owls.

18  (Dellasala Decl., ¶ 44).  The 2000 SEIS acknowledged that some bryophytes do not become

19  established in forests less than 100 years old and are best developed in 400 year old stands.  (00 SEIS

20  213).  However, contrary to Plaintiffs' assertion, neither these portions of the record nor the Dellasala

21  declaration assert that the <u>majority</u> of Survey and Manage species are most abundant in stands far

22  older than 80 years.

23  　　　　The Agencies respond that many Survey and Manage species are associated with late-

24  successional forests generally not just with old-growth forests.  More persuasively, they maintain that

25

ORDER - 21

1   there was no need to estimate the value of young mature forest (80 years old) versus old-growth

2   forest (200+ years old) because they analyzed the impact of eliminating the Survey and Manage

3   standard on each Survey and Manage species and noted which species were specifically associated

4   with old-growth rather than late-successional forests generally.  (04 SEIS 141-215).

5          While Plaintiffs' assertion that there is a qualitative difference between young mature forest

6   and old-growth forest may be valid, the 2004 SEIS contained a reasonably thorough analysis of the

7   effect on each species of the increase in young mature forest and the decrease in old-growth.  Plaintiffs

8   may disagree with the choice the Agencies have made based on that analysis, but that cannot be the

9   basis of a NEPA challenge.  The 2004 SEIS contains a reasonably thorough discussion of this issue.

10          E.  The Disclosures Related to Fire

11          Plaintiffs challenge the 2004 SEIS on the ground that it's use of the risk of fire as a rationale to

12   eliminate the Survey and Manage standard is based on erroneous premises and inaccurate data.  In the

13   purpose section of the 2004 SEIS that discusses the goal of healthy forests and timber outputs, the

14   Agencies stated that some Survey and Manage species were determined to be so numerous and

15   widespread that significant acreage was being set aside to protect them which "has limited the

16   Agencies' ability to restore forest health including fuel treatments[6] to reduce the threat of catastrophic

17   wildfire to watersheds and communities at risk."  (04 SEIS 6). The environmental impacts section

18   contains a lengthy discussing of the effects of wildfire and prescribed fire.  (04 SEIS 134-41).  The

19   ROD stated that Alternative 1 (retaining the Survey and Manage standard and maintaining the status

20   quo) is not the preferred alternative because "[o]ne of the major reasons that necessitates a change to

21   the existing situation is the Survey and Manage [standards and guidelines] interfere with the Agencies'

22   ability to implement hazardous fuel treatments as well as the other resource management projects

23   needed to implement the forest health goals identified in the [Plan]."  (04 ROD 24).

24

25          [6]  "Fuel treatments" refer to prescribed burning and/or selective logging.

1    Plaintiffs mount three specific attacks on the fire disclosures and analysis.  The first relates to

2    the geographic area involved, the second to program changes allowing greater flexibility in managing

3    Survey and Manage species around high-risk areas, and the third to the acreage deemed in need of fuel

4    treatments.  While the first and second attacks are not persuasive, the third is; the Agencies failed to

5    comply with NEPA in their analysis of the acreage in need of hazardous fuel treatments.

6                    1.  Geographic Area

7    Plaintiffs argue that the Agencies failed to take a hard look at whether the Survey and Manage

8    standard really presented a significant fire risk throughout the entire Plan area.  The SEIS stated that

9    most of the conflict between the Survey and Manage standard and the need for hazardous fuel

10   treatments occur in certain provinces in California.  (04 SEIS 137).  Plaintiffs contend that a conflict in

11   this limited geographic area does not justify eliminating the standard throughout the Plan area.

12   Relying on declarations by the former manager of the Survey and Manage program in Portland,

13   Oregon, Plaintiffs assert that all Forest Service and BLM units together identified only 13 Survey and

14   Manage species as hindering hazardous fuel treatments.  (Brumley Decl., ¶ 15).  According to

15   Plaintiffs, this further demonstrates the limited geographic area that presented any conflict.  The

16   Agencies counter that the impediment to fire treatments was only one of the reasons the Agencies

17   chose to eliminate the Survey and Manage standard and the fact that the Agencies disclosed the

18   geographic area where the conflict primarily occurred is sufficient under NEPA.

19   While it is true that elimination of the Survey and Manage standard was justified, in part, based

20   on what the SEIS describes as a conflict between the standard and hazardous fuel treatments, there is

21   no dispute that this was only one of the reasons.  As such, the fact that this conflict exists in a limited

22   geographic area, which the SEIS disclosed, does not render the SEIS invalid.

23                   2.  Management Recommendation Amendments

24   Plaintiffs also take issue with the 2004 SEIS's discussion of certain "management

25   recommendation amendments" adopted to allow for greater flexibility in management of Survey and

1    Manage species around communities at risk of fire.  Plaintiffs claim that these amendments sufficiently

2    reduced the risk of fire by allowing the Agencies flexibility in carrying out hazardous fuel treatments

3    and therefore there was no need to eliminate the Survey and Manage standard to reduce the risk.

4           Because these amendments were implemented in 2003, the 2004 SEIS noted "the full extent of

5    their benefits or shortcomings have not been realized."  (04 SEIS 137).  For some species, these

6    amendments allowed hazardous fuel treatments to be used around known sites of Survey and Manage

7    species.  For other species, the amendments did not provide such allowance.  (04 SEIS 137).

8           Plaintiffs have not asserted that these disclosures are inaccurate.  The SEIS disclosed sufficient

9    information to permit a reasoned decision.  The ROD need not restate this same information.  The fact

10   that Plaintiffs may have thought a better policy would have been to allow further time for the

11   amendments to have results, that cannot be the basis for a NEPA challenge.

12              3.  Acreage

13          Plaintiffs claim that the Agencies overestimated the acreage in need of hazardous fuel

14   treatments because the estimate is based on stale data and a faulty scientific methodology.

15   Consequently, they argue, the SEIS does not contain the requisite high-quality information and

16   accurate scientific analysis.  NEPA requires the EIS to contain high quality information and accurate

17   scientific analysis.  40 C.F.R. § 1500.1(b).  The EIS must disclose if information is incomplete or

18   unavailable.  40 C.F.R. § 1502.22.  Relying on outdated data or not acknowledging the limitations in a

19   methodology are grounds for setting aside an EIS.  Lands Council, 395 F.3d at 1032 (model did not

20   meet the EIS regulatory requirements "because there was inadequate disclosure that the model's

21   consideration of relevant variables is incomplete"); Espy, 998 F.2d at 704 (because EIS rested on

22   "stale scientific evidence" and contained an incomplete discussion of environmental effects and false

23   assumptions, it was proper to set aside the EIS).

24          The 2004 SEIS claimed that 476,000 acres should burn annually based on the historic natural

25   wildfire level.  (04 SEIS 136).  This is the baseline for determining how much acreage should be

ORDER - 24

1    treated annually.  The SEIS assumes that wildfires will burn 186,000 acres, leaving 290,000 acres in

2    need of hazardous fuel treatments.  However, according to the SEIS, 100,000 acres of the 290,000

3    cannot be treated "due to current budgets, personnel limitations, air quality concerns, and other

4    constraints ...."  (04 SEIS 136).  That leaves 190,000 acres available and in need of treatment.

5    Eliminating the Survey and Manage standard will result in a relatively modest increase in the acreage

6    available for treatment – only 8,500 acres.  (04 SEIS 139).

7         Relying on a declaration by Dr. Dennis C. Odion (a Ph.D research biologist with the University

8    of California, Santa Barbara), Plaintiffs asserts that the fire-scar analysis methodology used to derive

9    the baseline 476,000 acre figure was known to be flawed at the time the Agencies drafted the 2004

10   SEIS because it is biased towards resulting in a higher acreage than is warranted.  (Odion Decl., ¶¶ 14-

11   16).  Relying on this same declaration, Plaintiffs also assert that the 186,000 acre figure of what burns

12   naturally each year due to wildfires is an underestimate because it relies on a decade of data (1986-

13   1996) when fires were less frequent and ignores more recent data (from 2000 on) when fires occurred

14   more.  According to Plaintiffs, because the acreage that should burn each year is artificially high and

15   the acreage that naturally burns due to wildfires is artificially low, the resulting acreage in need of

16   hazardous fuel treatments is artificially high.  Thus, Plaintiffs argue, the 2004 SEIS must be set aside

17   because it relies on an outdated methodology and outdated data.

18         The Agencies counter that the 2004 SEIS's estimate of 476,000 acres was taken from the

19   2000 SEIS, which set forth the same estimate.  (00 SEIS 210).  However, an agency preparing a SEIS

20   cannot simply rest on the previous EIS or SEIS if there is new information that may alter the

21   environmental analysis.  "The agency must be alert to new information that may alter the results of its

22   original environmental analysis ...."  Friends of the Clearwater v. Dombeck, 222 F.3d 552, 557 (9th

23   Cir. 2000).  Most of the literature discussing the problems with this methodology appears to have

24   come out since the 2000 SEIS.  As such, the Agencies should have disclosed these problems with their

25   methodology.  Similarly, the Agencies should have disclosed potential bias due to the reliance on a

1    particular decade of data regarding the frequency of wildfires and discussed why the Agencies chose

2    not to incorporate more recent data which reflected a different amount of acreage consumed by

3    wildfires.  Absent such disclosures, the public and the decisionmakers were deprived of important

4    information on a matter that the SEIS had identified as a problem caused by the Survey and Manage

5    standard and a justification for eliminating it.

6           Additionally, the 2004 SEIS failed to explore possible solutions to the budget, personnel, and

7    other problems that prevented the Agencies from treating the 100,000 acres that are already available

8    for such treatments.  The Agencies failed to take a hard look at whether the 8,500 acre gain by

9    eliminating the Survey and Manage standard would still be necessary if these other constraints were

10   resolved.  As such, the Agencies failed to provide sufficient information to the public and the

11   decisionmakers to allow a reasoned decision.  "The purpose of NEPA is to require disclosure of

12   relevant environmental considerations that were given a 'hard look' by the agency, and thereby to

13   permit informed public comment on [the] proposed action and any choices or alternatives that might

14   be pursued with less environmental harm."  Lands Council, 395 F.3d at 1027.

15          F.  The Cost Analysis

16          Plaintiffs maintain that the 2004 SEIS contains inflated cost estimates of the Survey and

17   Manage program.  The projected costs of maintaining the Survey and Manage standard are based in

18   part on the cost of hazardous fuel treatments.  (04 SEIS 139-40).  Plaintiffs maintain that because the

19   number of acres in need of treatment is artificially high, this part of the cost estimate of maintaining the

20   Survey and Manage standard is likewise artificially high.  Plaintiffs also contend that the Agencies

21   overestimate the cost of pre-disturbance surveys.  This, according to Plaintiffs, only compounds the

22   inflated cost estimate for hazardous fuel treatments that the Agencies attribute to the Survey and

23   Manage standard since the standard requires pre-disturbance surveys prior to conducting hazardous

24   fuel treatments.  Additionally, Plaintiffs argue that the inflated pre-disturbance survey costs results in

25

1    an overestimation of the Survey and Manage survey's actual contribution to the total costs of projects
2    such as timber sales.

3          Plaintiffs' argument is persuasive in part.  Because the analysis of the acreage discussed above
4    is inadequate, the disclosures and analysis of the cost estimates based on those acreage figures is
5    similarly inadequate.  However, the Agencies' estimate of the costs of pre-disturbance surveys does
6    not suffer the same deficiencies.  As support for their contention that the Agencies overestimated the
7    costs of pre-disturbance surveys, Plaintiffs rely on a declaration by the former manager for the Survey
8    and Manage program in Portland, Oregon.  (Brumley Decl., ¶ 27).  According to Mr. Brumley, the
9    Agencies' estimate of pre-disturbance survey costs are double what other pre-project surveys cost but
10   there is no basis to support this estimate.  However, as the Agencies point out, these cost estimates are
11   based on the 2000 SEIS, modified to take into account changes in the program such as reduced costs.
12   On this issue, the Agencies have reasonably relied on their prior analysis and have disclosed new
13   information relevant to that analysis.  This was sufficient under NEPA.

14   II.  The National Federal Management Act and the Federal Land Policy and Management Act

15         Plaintiffs claim that the 2004 ROD violates both NFMA and FLPMA.  The Court does not
16   reach Plaintiffs' NFMA and FLPMA claims.  Pending further compliance by the Agencies with NEPA,
17   there is no need to address the merits of Plaintiffs' NFMA and FLPMA claims.  See Leavenworth
18   Audubon Adopt-A-Forest Alpine Lakes Prot. Soc. v. Ferraro, 881 F. Supp. 1482, 1493 (W.D. Wash.
19   1995); Moseley, 798 F. Supp. at 1484.

20   III.  Injunctive Relief

21         Plaintiffs request that the Court order that no known sites of Survey and Manage species be
22   released from protective buffers, and no LSOG forests in the Matrix or AMAs be logged without
23   completion of surveys as required by the 2001 ROD (prior to the 2004 ROD) and without site-specific
24   NEPA analysis.  The Agencies counter that the Court should allow further briefing on the appropriate
25   injunctive relief.

1      The Agencies' argument on this issue is well-taken. "Injunctive relief is an equitable remedy,

2 requiring the court to engage in the traditional balance of harms analysis, even in the context of

3 environmental litigation." <u>Forest Conservation Council v. Forest Serv.</u>, 66 F.3d 1489, 1496 (9th Cir.

4 1995). The Court cannot engage in this traditional balancing of harms analysis based on the parties'

5 summary judgment briefs. Furthermore, in the Court's October 27, 2004 order on Defendant-

6 Intervenors' motion to intervene, (Dkt. No. 51), the Court denied permissive intervention in the

7 liability phase but explicitly granted permissive intervention in the remedial phase to allow Defendant-

8 Intervenors to participate in defining the scope of any injunction. Therefore, the Court will confer

9 with the parties to establish a briefing schedule for the remedial phase of the suit.

10 CONCLUSION

11      The Court GRANTS in part and DENIES in part Plaintiffs' motion and DENIES Defendants'

12 motion. Defendants failed to comply with NEPA in preparing the 2004 SEIS. Defendants failed to

13 analyze potential impacts to Survey and Manage species if they are not added to or are removed from

14 the Forest Service's and BLM's respective programs for special status species. Defendants failed to

15 provide a thorough analysis of their assumption that the late-successional reserves would adequately

16 protect species that the Survey and Manage standard was introduced to protect, particularly in light of

17 their previous positions in earlier environmental impact statements. Lastly, the Survey and Manage

18 standard was deemed a hindrance to hazardous fuel treatments, which served as part of the

19 justification for eliminating the standard. However, Defendants failed to disclose and analyze flaws in

20 their methodology for calculating the acreage in need of hazardous fuel treatments. Part of the cost

21 analysis was similarly flawed because it relied on the acreage in need of hazardous fuel treatments in

22 calculating the cost of the Survey and Manage standard.

23      The Court denies without prejudice Plaintiffs' request for an injunction. With the benefit of

24 additional briefing, the Court will be able to determine the appropriate remedy. The Court will not

25 enter a final judgment until it has ordered the appropriate injunctive relief.

ORDER - 28

1    The clerk is directed to provide copies of this order to all counsel of record.

2    Dated: August 1, 2005

3

4

5

6    Marsha J. Pechman
     United States District Court

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25